and all. Arguments not to exceed 15 minutes per side. Mr. Gerhard Stein for the appellants. One second, let's let your adversary sit down. Okay, you may proceed. May it please the court, I reserve three minutes for rebuttal. You may. This case is not a summary judgment case. There were three findings of fact by the district court that should have been reserved for the jury. Was Cordell Drummond in custody when he was held on his grandmother's yard at gunpoint, bleeding? Were the officers interfering with his own ability to hold his leg and prevent that blood from coming out? And was the safety situation so severe that the interference that the officers engaged in was reasonable? And therefore it was okay to let him bleed for six minutes until the EMS got there. Let's look at it a little bit from the officer's side too. Because they were just called to the place. And what time of day was it? It's like one o'clock in the morning. They're out there in the dark. Right. And there's a guy who has just had a gun. Right. And they don't know where the gun is. He may have it. He just shot himself in the leg. Right. And so they're unclear as to what they ought to do in this situation. Right? No. No? No. If you were there, what would you do? Well, they've got the area secure. They're holding him at gunpoint. He's bleeding profusely and he's got that death rattle saying, I'm going to die. And they're starting, they're believing him. They don't cuff him. They don't put on their gloves. They call the ambulance. They do call the ambulance. And... What else would you have done? I sent my brother officer, as they did, to go find the gun. They believed him when he said, I don't have the gun anymore. And sure enough, by the time the EMT got there, they found the gun. They've got him secure at gunpoint. And at that point, there's an officer with gloves in his car who either could have come over and helped put pressure on the wound or they at least couldn't have, they should not have, ordered him to lie down in such a way that he's then laying back, not holding his leg. Is he not holding his leg? And that's what we need to try the case about. The way I read it, and tell me where I'm wrong, there's some question about sitting up or sitting down, but I didn't see anything where it said, take your hands away, and he did. Good point. That's one of the big issues in the trial. Well, but we've got to have some evidence. Did somebody, is there anything in the record that says, let go, and he did? Yes. Grandma, Gail Lewis, it's at her yard. She's standing there watching, and she says when the EMT got there, he's lying back with his hands like this, and before then. Does anybody say the officers told him to do that? Oh, yes. Eva Hunter said the officers yelling at him, get down, get down. Well, that's different from take your hands away. That's what I'm saying. Well, it was impossible to hold his leg in the manner in which it would really interfere with the bleeding while he's lying down. And Jason, his uncle, also heard that, get down, and saw his hands at his side. But the biggest thing, Judge. I thought Eva Hunter's testimony was that he had his hands on his leg the entire time. No, she said that when he lied down, his hands were back from where the blood was coming out, that it had rolled back. But these are the types of facts that we need to try the case over. This is not summary judgment material, because there is a difference. And one of the, I'm sorry? Do you create a disputed issue of material fact because your witnesses disagree? Our witness, no. Our witnesses disagree with the officers. And one of the major disagreements is that the officers said that they were talking to Cordell Drummond all the way up until the time EMS got there, and EMS says that he was unconscious when they got there. And if he's unconscious, he's not holding his leg in a way that's going to prevent the bleeding. And, of course, he does die from bleeding to death. And the ambulance got there within about how long? Six minutes. Yeah, which was predictable. And everybody I deposed said, yeah, we know that would be about the length of time. And they all knew that bleeding, you can bleed out in six minutes. And that's why this is such an important issue, because he was in custody. He's got a gun on him, and he's being told to lie back. And so if you're going to take that sort of control over the situation as an officer and then not give him that sort of emergency first aid, which would be putting pressure on the wound, then he's going to die. And that's what happened. And so the issue is, was the law clearly established that a person in custody is deserving of that level of medical care? And the judge said, well, he's not really in custody, because here are three cases that say when a person's unconscious, then the officer's actions don't matter. They aren't really placing him in custody. You're right about custody. You are saying that you could automatically get a trial, right? If you're correct. Given the rest of the contested facts, yes. Is that because everything that happens to a person in custody is a state-created danger? I mean, because the underlying doctrine here, right, is DeShaney state-created danger. Obviously he created the danger initially by shooting himself. The question then is, what happens thereafter? Right. Did they prevent him from getting care? That's correct. And I'm not saying that. I mean, there may well be scenarios where everything that happened doesn't trigger a federal lawsuit. But in this case, on these facts, where they're watching him bleed, and, you know, where they have noticed that this is serious. I mean, not only are they watching him and they tell the EMS to step it up, but they're also in a situation where Grandma looks at the officer and says, what are you going to do? Because she can tell that he's really bleeding out. The blood's pouring that fast. Do you have to overcome a qualified immunity standard here? There is no qualified immunity because the law was clearly established at the time. But my question is, do you have to show that qualified immunity is not present here? Yes. And in order to do that, you have to show that the law, the constitutional law, is clearly established that in this situation the officers should what? Not have taken him in, assuming you can show custody, not have taken him into custody? The clearly established law would say what? Good question. And we're not claiming. Thank you. I mean, I want to be in the real world. And that's what you're saying when you first said let's look at this from the officer's perspective. And that's fine. I'm not saying the officers shouldn't have taken him into custody. They don't know where the gun is. That's fine that they hold him at gunpoint. But at that point, they are now in charge of the situation. If they had chosen not to take him into custody, Grandma would have put a tourniquet on him. Grandma would have. You can't have a catch-22 here. You can't say on the one hand that. . . Where was she going to put the tourniquet? Above the bleed. And our expert says that that would. . . Where was the bleed? I thought he shot himself in the thigh. Yes, right. Around his waist? At the top of the leg, she would have put the tourniquet. And our expert says that that would have increased his chance of survival by over 50%. Did she say that at the time to the officers, or did she only say that in the deposition? No, she didn't say it at the time to the officers. Let me ask you this about the gun, because we went back and forth. Initially you said, he said, I don't have it, and the officers believed him. And then later you said they were still looking for the gun. Why do you say they believed him as opposed to, you know, they sent somebody to look, but at the same time they thought it was possible that it was under him, and even a bleeding man can shoot you? Again, I want to try this, but we need to debate it, too. I say they believed him because, number one, one of the officers put his gun away and went and looked for it. So he retraced the steps. But there were others still holding their guns where they were. There was one other still holding, and there was a third, and they did not cuff him. They did not cuff Cordell Drummond. They only waited, and they didn't, you know, they didn't take any additional measures. If they really thought he was armed at the time, they would have cuffed him so that he couldn't reach for a gun. Somebody that says that, and, you know, I'm not an officer, but as between getting up on a guy who may have a gun under him and keeping him at gunpoint at some distance, I'm not sure which is the safer thing. Well, what our expert and what will establish at trial and what the record already establishes is that they knew the next thing that was going to happen is EMS was going to approach him, and they owe a duty to EMS to make sure that the scene's secure, and they actually called EMS and said the scene's secure. So they didn't stage EMS like they would normally do. They let EMS come right up to this man, so they didn't really think that he was going to shoot anybody. And what we're really dealing with is a person that was bleeding profusely, and the law, to get back to your question, the law was clearly established at that time under the Jones case that you have a duty to provide emergency medical care even while you're waiting on EMS. In fact, there was one defendant in Jones. There were nine defendants in Jones. Nathaniel Jones was beaten up by some Cincinnati cops. He's not lying there on the ground. There's one defendant in particular, a sergeant, who comes up and says, this guy's not breathing, and calls EMS. But he's still denied qualified immunity because he doesn't roll him over. He doesn't do some basic things that you're supposed to do with positional association while you're waiting for EMS. So even though that's not identical, that's the kind of law that under our qualified immunity jurisprudence gives the defendants fair warning. The case you're relying on, or cases you're relying on, that these officers should have known what to do under clearly established law. Yes. That clearly established law is what? Jones v. City of Cincinnati. And what I'm also relying on is just the basic notion of a duty to give medical care, which has been established for a long time, to people in custody. And I relied, in our brief, we traced Hope v. Peltzer, because qualified immunity can either be so narrowly interpreted that nobody ever moves the law forward, or it can just make sense. And the key phrase is, did prior law give fair warning? In this case, prior law did give fair warning. And tracing, like Hope v. Peltzer does, the notion that, well, you can look at the general rules. In Hope v. Peltzer, they had an Alabama prison regulation. Here we had a Springfield Township jail regulation, which said if you've got a bleeding prisoner, you're supposed to put pressure on the wound. If we should think that he was in custody, then what should we do with this case? Remand and give the family a trial. Tell the district judge what? Tell the district. There are also other defenses here. For example, the immunity defense, qualified immunity defense as well. And as far as I know, the district judge hadn't ruled on that, right? Well, no. The district judge did say that the officers had qualified immunity, and I thought she did it incorrectly in the sense that she failed to apply clearly established law on both the Descheny State Created Danger Exception and on the Private Rescue Exception. No, what I would say is you reverse, you direct that there ought to be a trial. The trial is on whether the officers were deliberately indifferent to the safety and health of Cordell Drummond while they held him at gunpoint in his grandma's yard. And we've got contested issues of fact that go to all the elements of that deliberate indifference claim and to the state created danger claim. And then the family would get. . . You have to have the state created danger claim to get a remand. That's a separate leg from the private rescue claim. You either have to have private rescue or the state created danger. Yes, yes, because state created danger is the fact that they failed to give him any care at all while they were holding him in custody. I'm not challenging the fact that they held him in custody. That's okay. It's just that if you're going to take charge, then you have to give emergency medical care. Okay. Thank you, Counsel. Thank you. I have your time for rebuttal. Good morning, Your Honors. Larry Barbee here for the Appeals to Defendants. The qualified immunity defense in Ashcroft v. L. Kidd stated, the plaintiff must show the contours of the right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right. Did the district court actually explicitly rule on the qualified immunity defense in the case? I thought primarily the district court ruled that there was no custody and hence no responsibility under DeShaney to do anything other than what would be sort of reasonable. Actually, the district court did rule that there was qualified immunity. And what the district court ruled was, it's doubtful that he was in custody because his own injuries incapacitated himself. But even assuming he was in custody, what the officers did was not deliberately indifferent and did not violate clearly established law. So that's how the court got to the fact that there was qualified immunity. The court did not deal with the issue of municipal liability insofar as whether any policy or custom of Springfield Township was a moving force behind this alleged constitutional violation. In addition to the custody issue, you're saying we need to reach, in addition to the qualified immunity question in the case, if we should think that there was custody. Right. And what else? Well, it's our view. If the court finds that there was custody, which we would dispute, we'd say there's no custody because his injuries... They're standing there and he's on the ground and they're all pointing a gun at him and telling him what to do. It's kind of hard to say, you know, that there's no custody in that. But he couldn't move anyway. I mean, he shot himself, he was lying on the ground. Their duty at that point is to secure the scene. But to answer your question, the first question is, is it clearly established law that the officers have to do more than just summon first aid? Is there a clearly established law that says that they have to actually give hands-on and do first aid to this person themselves? And there is not. Why doesn't the six-minute time frame in Jones satisfy clearly established law? And we're talking about the same time. Well, no, we're not talking about the same time. There's a couple of differences. First, in Jones, the officers injured the person themselves. I mean, the officers committed the acts themselves. So they clearly created that danger. Right. And in Jones, what the court said is the police savagely beat, maced, and handcuffed plaintiff. They knew he had stopped breathing. And this was on a motion to dismiss. The officers delayed calling for medical aid and then went a step further and did not remove the handcuffs, which delayed the administration of aid and hastened his death. I would suggest to the court a thorough reading of all these Sixth Circuit cases, including Scazzari, which was decided after this incident. In Scazzari, the court said, reasonable officers would have known, based on this circuit's precedent, that the obligation to provide adequate medical care to an injured detainee is not discharged merely by calling for assistance, but extends to ensuring the medical responders are able to access the victim without unreasonable delay. Now, the only cases that say that the police officers have any obligation are the cases where the police officers have injured the person themselves. So your position is the law in the Sixth Circuit is if a police officer comes upon you and you've injured yourself, then they can just sit there and watch you die. I would say yes. I would say that's the law under DeShaney. But that's not what happened in this case. But I say that's the law under DeShaney. They have no obligation. But if they've taken them into custody, they've got an obligation. If they've taken them into custody, if you find they've taken them into custody, what the obligation is is to summon first aid and secure the scene so that the first responders do not have to stay somewhere else. But don't Owensby and Jones both speak to the issue of the importance of the time frame is that it gives the officers the opportunity to consider the probable causes, the probable circumstances, what might occur. And it's that ability to deliberate that places upon them the burden to do something. That discussion in both of those cases talks about the fact that whether or not shocks the conscience or deliberate indifference is going to be the standard that's used to judge their conduct. But Owensby clearly says that the police can discharge their duty to the prisoner or to the person who has been injured by the police by summoning assistance. Jones says the same thing. What Scazzari says and what Jones says is if the police summon assistance, they have to do what they can to secure the scene so that the first aid people can get there quickly. Now in this case, first to answer a question from the previous that was asked to the appellant's counsel, the police officers testified they didn't believe the person when he said he didn't have the gun. They didn't believe Cordell Drummond when he said he no longer had the gun. That's why they weren't looking for it. The police officer's obligation at that point is to secure the scene. The emergency station is only a couple miles away. They don't know how long it's going to take them. The officers, the first call was at 112. At 112 a.m. there's a call that the plaintiff is shooting his gun into the ground. The officers arrive on the scene about 115. I mean, they're there right away. They walk up to Cordell Drummond to ask him, are you the one who was shooting the gun off, or do you know anything about it? He goes running away. That's when he shoots himself. That's somewhere between 115 and 116. At 116 the officers immediately call for first aid, immediately. They didn't hurt him. They didn't even know at that point in time exactly what had happened. They immediately called for first aid. That's 116. The first aid people are coming for a couple miles away. They don't know how long it's going to take. A couple minutes later Sergeant Roberts shows up on the scene, sees what's happening, gets on the mic right away and says, step it up, get here quicker, EMTs. They don't know when he's coming. When Gail Lewis and Mr. Drummond come up to the officers while they're on the scene, they're talking, what's going on? The officers think the EMTs are going to be there any minute. Their job is to keep the scene secure so the EMTs can get right to Mr. Drummond to work on him immediately. They're hoping he gets there quick. And if the scene is secure and they're holding him at gunpoint, don't they have him in custody? I would say no. Why not? For the same reason the court said no, because what they're doing is they're trying to secure the scene. They're not holding him in custody. There's Jackson v. Schultz. But they found that it was secure because they didn't require staging and they allowed the EMTs immediately to come to give him treatment, which is in their favor, I get that, but it's an indication that they found the scene secure, which would indicate that they're holding him in custody. I think it's an indication that they thought that the scene was at least secure enough so that the EMTs could come in. One of the things that's also going on at this time, it's 116, 118, 120, when they're waiting for the EMTs, people are coming out of their houses, they're milling about, they're shouting, the officer's looking for a gun, they don't know exactly what's going on. Who called the police? The police were called by a neighbor when he heard Mr. Drummond shooting his gun into the ground. What does the record show they said to the police station? It was a 911 call that said someone had fired shots. In the neighborhood? Right. And they gave the address? Right. And so they then immediately go out there, and what they find is the fellow, and he runs off and mistakenly shoots himself in the thigh. Right. The call about the shots fired is 112 AM, December 6th. It's the middle of winter, 110 in the morning, it's dark. They arrive on the scene within three minutes. They walk up to Cordell Drummond. He runs away. He shoots himself. So at 116, they call the squad. The police do know, I take it, that if they take someone into custody, if they take someone into custody, they then have added responsibilities to give aid and to try to provide for the welfare of the person they've taken into custody. That much is affirmative law, right? True. True. And our position is even if you find that he was in custody, Sixth Circuit law says that it's the obligation of the police officers to summon first aid and to make sure that the scene is secure so that the first responders can get there and administer aid to them. What about the positional asphyxia cases where they say, you know, you should roll him over? Well, that's what the Jones case said, and they said in that case they should have taken the handcuffs off so that the first responders could have gotten there more quickly, could have gotten to him and treated him right away. But that's what they said in Jones. So they made it more difficult for the first responders to do what they wanted them to do. In our case, all our officers did was stay with him, talk to him, tell the first aid people to step it up. They didn't do anything to make it more difficult. They didn't hurt him. They didn't know. In the positional asphyxia cases, the officers are sitting on top of the guy. Our officers, all three of the officers testified, they didn't know exactly what the injuries were. They didn't know how serious the injuries were. They could see he was bleeding. They didn't feel comfortable treating him or doing anything with him because they didn't know the extent of the injury or even where he had shot himself. They thought the squad was going to be there any minute, so from their viewpoint, not looking at it in 20-20 hindsight, from their viewpoint, they did what was reasonable. They called the squad. They told the squad to step it up. They did their best to keep the scene secure. And when the squad arrived, the squad got right to them. They didn't know it was going to take six minutes. They didn't know how long it was going to take, but they thought it was going to be soon. What is the justification for not letting his family, knowing that he's on the ground bleeding, not letting his family try to administer aid to him? What is the reason? Well, they didn't say that they wanted to administer aid, and they didn't know. Our officers didn't know who they were. They had a flashlight. They could see the circumstance there, and they could see the family people who wanted to try to give aid, couldn't they? Well, they didn't say they wanted to give aid, and the law is that if our officers don't know whether they're in any way qualified to give aid, they don't have any obligation to let them. Our officers didn't know anything about their qualifications, didn't know who they were, didn't know where the gun was at that point. I mean, the officers are trying to keep the scene secure. They're not going to just let anybody from the neighborhood come up and start going hands-on with Cordell Drummond, who's lying on the ground. That would not be keeping the scene secure. Who knows? So there's no evidence that the people who came up were relatives or seeking to give him aid? I don't think so, Your Honor, and also there's no evidence that our officers knew anything at all about their qualifications to give aid. Well, what did the officers either hear by their testimony or what did the other people say? When I asked your adversary, he said that there are various things that were said at deposition, but what's your understanding of the record? Somebody said, what happened? And they gave him an answer. Did anybody say, I'm a nurse, or let me at him with a tourniquet, or anything of that sort? No. Nobody said anything like that. What else is your understanding of what was said by the? People were saying, what happened? And our officers are saying, stay back. The life squads, we've called the life squad. They're on their way. That's what the officers are saying. And the officers expect the life squad to arrive at any minute. They don't know the qualifications of the people there. Eva Hunter said in her deposition on page 65 that he was holding his leg, and the officers were saying, lie down. And she saw it for about two minutes. Now, you're always told, I mean, common knowledge is, if someone's injured, don't move them. Tell them to stay still. That's what the officers are doing. They're not going to let somebody from the neighborhood come up and just roll them over or do something to them or take a scarf off and wrap it around his waist or around his thigh or whatever. I mean, it's their job. There's no evidence that they were even asked that. No, I don't believe so, Your Honor. I don't believe so. But there's no evidence that that was said. I mean, there are two parties here, what the officers heard, what the people say they said on the scene. That's what I'm focusing on. The testimony is that the people said, What happened? What's going on? And the officer said, Stay back. The life squad has been called. And that's where the officers were going with that. There's an agreement in the evidence that nobody said, I can do, I'm capable of rendering first aid, let me. I understood that there was no dispute about that. There's no dispute about that. That's clear in the record. And, you know, the point has been made that there are some material issues of fact here. The issues of fact are not material. The fact of the matter is that the Sixth Circuit law, now the plaintiff's trying to cite some cases that happened after this to show that the officers had a duty to go hands-on with first aid, but the Sixth Circuit law was clearly established at this time that it was the duty of the officers to secure the scene and to summon first aid. You've got a material issue of fact, it seems to me, on custody, don't you? Custody is a question of law. I mean, the facts are not in dispute. He shot himself. He's lying on the ground. The officer is holding a gun on him. There's no dispute about those facts. If the court finds, as a matter of law, that that's custody, then the issue is, then what's the duty of the police officers? Our position is, if the court finds that's custody, it's the duty of the police officers to summon aid and to secure the scene. And that's exactly what they did under the circumstances of this case. As I said. Your position is, even if Mr. Drummond was in custody, that the case before us does not rise to the level of a state-created danger. Right, and the officers were not deliberately indifferent. In other words, their actions did not so chill the society. They weren't so reckless and substantially causing a risk that they were chilling to society. Qualified immunity standard is every reasonable officer would have known, given all of these circumstances, that the only right choice was to go in and grab his leg. That's correct. And Judge Beckwith, who had an opportunity to review this in her chambers and look at all the law in the Sixth Circuit on this issue, found that they did not have that obligation. And that's the same thing the police officers did on the scene. What colors this case for me to some extent is that it seems clear to me that the guy was in custody. And for the district judge to say the person was not in custody colors the rest of the holdings of the district judge. You know what I mean? I understand what you're saying, Your Honor, but I think what the judge actually said was that it was doubtful that he was in custody, but even if he was in custody, what the officers did did not rise to the level of deliberate indifference. Okay, anything else? Thank you, Counsel. Thank you very much. Mr. Herdstein, you have three minutes for rebuttal. Thank you, Judge. I'm still working on the state-created danger issue. Let's assume he's in custody. They're holding a gun on him. Tell me, give me the best case you have for saying that the law was clear that what the police officers did here amounts to a state-created danger. The law was clear that if he was in custody, the law was clearly established that they had a duty to put pressure on his wound. The state-created danger is the fact that he's in custody, that they have restricted the flow of people to him. Because if he wasn't in custody, they would have let Grandma come up to him and deal with him. They would have let Uncle, they wouldn't have put Uncle in the car, in the police car. Is there evidence that they knew this was Grandma or this was a relative and the person wanted to administer aid to him? Is there evidence of that? There is evidence that these were people very concerned about him. Grandma actually looked at the officer and said, what are you going to do? And all, you know, these are law-abiding citizens. I mean, they're told by the officer to get away. They aren't going to fight with the officer and say, you know, I'm going to put a tourniquet on him. But to get back to your question, the law was clearly established at that time under Jones and Sergeant Battison that calling EMS is not enough. If you know that the time could well be before EMS gets there that this man's going to die, in the Jones situation, they had a duty to roll him over, not just to take the cuffs off, but to roll him over. And they ended up, you know, doing a sternum rub and doing some vitals and things that ultimately got the officer off when they did their actual trial or factual analysis. Jones is actually very helpful because there's a 2008 decision on the pleadings only that said Battison doesn't get qualified immunity because it doesn't look like he did anything. And then there's a 2012 decision that gave him qualified immunity because lo and behold, when they did the facts, he did more than just call EMS. That's exactly where we're at. These officers did nothing. They didn't put pressure on the wound. There was a clear duty and need to put pressure on the wound, and they didn't let anyone else do it either. They're supposed to know what to do if they're not physicians, nurses, health care. How are they supposed to know what to do? Well, if this man was in custody in the jail, they had a clear regulation that said you've got to put pressure on a bleed if you're in the jail. We have to agree that custody in a jail in the safety of a facility controlled by the officers is distinct from the situation here, and that's why we're trying to look to the cases that are out there in the reality of what's going on, and that's why I'm asking you to give me. Do you think Jones? I think Jones is directly on point. And what's helpful about Jones is that there were nine officers. Here there's three. So if we were going one-on-one, I may not be here because then you'd only have powers. There were three to begin with, and then in the midst of the six minutes, Roberts comes. Roberts comes. He was not there at the beginning, and at one point you had only one police officer holding the gun on him while the other police officer goes and looks to see if there is in fact a gun out there. And when Roberts is there, you have the help you need to put pressure on the wound and possibly save his life. And that's what the trial should be about. This is not summary judgment. When is the gun found? Right as EMS gets there. Okay. So it's not that he says, oh, we got the gun. Now go help him. No, no. He's off looking for it, and he finds it just about the same time. Where it is is still unknown. Okay. Thank you, counsel. Thank you very much. Any more questions? Thank you. The case will be submitted. The clerk may call the next case.